UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

| | |
|---|---|
| MARCELLINE WALTON, ) | |
| ) | |
| Plaintiff, ) | Case  No. EDCV 06-371 AJW |
| ) | |
| v. ) | MEMORANDUM OF DECISION |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of the Social ) | |
| Security Administration, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

Plaintiff filed this action seeking reversal of the decision of defendant, the Commissioner of the Social Security Administration (the "Commissioner"), denying plaintiff's applications for disability insurance benefits and supplemental security income ("SSI") benefits.  The parties have filed a Joint Stipulation ("JS") setting forth their contentions with respect to each disputed issue.

**Administrative Proceedings**

The parties are familiar with the procedural facts, which are summarized in the Joint Stipulation. [See JS 2]. The Administrative Law Judge ("ALJ") denied benefits in a December 2007 written hearing decision that constitutes the Commissioner's final decision.[1]  [Administrative Record ("AR") 16-22; JS 2].

---

[1]    The ALJ's December 2007 decision incorporates by reference his prior October 2002 written hearing decision denying benefits. [AR  52-57]. After plaintiff sought judicial review of that decision, the parties stipulated to a remand for further administrative proceedings under sentence

1   The ALJ found that from April 27, 1999 through the date of his decision[2], plaintiff had severe impairments
2   consisting of left carpal tunnel syndrome; degenerative joint and disc disease of the cervical, thoracic, and
3   lumbar spine; hepatitis C infection; history of arthralgia and irritable bowel syndrome; depressive disorder
4   not otherwise specified ("NOS"); and history of substance abuse, in remission. [AR 18; JS 2]. The ALJ
5   denied benefits on the ground that plaintiff retained the residual functional capacity ("RFC") to perform
6   medium work and therefore could perform her past relevant work as a photographer and photo laboratory
7   technician. [AR18-22; JS 2].

**Standard of Review**

9   The Commissioner's denial of benefits should be disturbed only if it is not supported by substantial
10  evidence or is based on legal error. Stout v. Comm'r Social Sec. Admin., 454 F.3d 1050, 1054 (9th Cir.
11  2006); Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002). "Substantial evidence" means "more than
12  a mere scintilla, but less than a preponderance." Bayliss v. Barnhart, 427 F.3d 1211, 1214 n.1 (9th Cir.
13  2005). "It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."
14  Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005)(internal quotation marks omitted). The court is
15  required to review the record as a whole and to consider evidence detracting from the decision as well as
16  evidence supporting the decision. Robbins v. Soc. Sec. Admin, 466 F.3d 880, 882 (9th Cir. 2006);

---

six of 42 U.S.C. § 405(g) because the claim file on which the October 2002 decision was based had been lost. On remand, the claim file was reconstructed, and new evidence also was submitted. Some exhibits that were part of the original claim file, however, apparently could not be reconstructed and remain missing from the reconstructed claim file (which was filed as the certified administrative record in this case). [See AR 3 (identifying missing exhibits)]. There also appear to be differences in the numbering of some exhibits in the original and reconstructed versions of the administrative record. Where relevant to the issues, the significance of any such discrepancies will be discussed.

[2]   Plaintiff filed prior applications for benefits that were finally denied through April 26, 1999. The ALJ did not reopen those applications; therefore, the period under consideration is April 27, 1999 through December 10, 2007, the date of the ALJ's decision on remand. See Udd v. Massanari, 245 F.3d 1096, 1098-99 (9th Cir. 2001) ("A decision not to reopen a prior, final benefits decision is discretionary and ordinarily does not constitute a final decision; therefore, it is not subject to judicial review.") (citing Califano v. Saunders, 430 U.S. 99, 107-109 (1977)); see Lester v. Chater, 81 F.3d 821, 827 (9th Cir. 1995) (holding that the Commissioner properly applied res judicata to bar reconsideration of a period for which a prior, final determination had been made by declining to reopen the prior application).

Verduzco v. Apfel, 188 F.3d 1087, 1089 (9th Cir. 1999). "Where the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld." Thomas, 278 F.3d at 954 (citing Morgan v. Comm'r of Soc. Sec. Admin., 169 F.3d 595, 599 (9th Cir.1999)).

## Discussion

**Medical opinion evidence**

Plaintiff contends that the ALJ failed properly to consider the opinions of a treating psychiatrist, a consultative psychiatric examiner, and a non-examining state agency physician. [See JS 3-11].

In general, "[t]he opinions of treating doctors should be given more weight than the opinions of doctors who do not treat the claimant." Orn v. Astrue, 495 F.3d 625, 632 (9th Cir. 2007)(citing Reddick v. Chater, 157 F.3d 715, 725 (9th Cir. 1998)); see Tonapetyan v. Halter, 242 F.3d 1144, 1148 (9th Cir. 2001). A treating physician's opinion is entitled to greater weight than those of examining or non-examining physicians because "treating physicians are employed to cure and thus have a greater opportunity to know and observe the patient as an individual. . . . ." Edlund v. Massanari, 253 F.3d 1152, 1157 (9th Cir. 2001) (quoting Smolen v. Chater, 80 F.3d 1273, 1285 (9th Cir. 1996) and citing Social Security Ruling ("SSR") 96-2p, 1996 WL 374188)); see 20 C.F.R. §§ 404.1502, 404.1527(d)(2), 416.902, 416.927(d)(2). An examining physician's opinion, in turn, generally is afforded more weight than a non-examining physician's opinion. Orn, 495 F.3d at 631.

When a treating physician's medical opinion as to the nature and severity of an individual's impairment is well-supported and not inconsistent with other substantial evidence in the record, that opinion must be given controlling weight. Orn, 495 F.3d at 631-632; Edlund, 253 F.3d at 1157; Social Security Ruling 96-2p, 1996 WL 374188 SSR 96-2p, 1996 WL 374188, at *1-*2. The ALJ must provide clear and convincing reasons, supported by substantial evidence in the record, for rejecting an uncontroverted treating source opinion. If contradicted by that of another doctor, a treating or examining source opinion may be rejected for specific and legitimate reasons that are based on substantial evidence in the record. Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1195 (9th Cir. 2004); Tonapetyan, 242 F.3d at 1148-1149; Lester v. Chater, 81 F.3d 821, 830-831 (9th Cir. 1995).

**Treating psychiatrist**

Plaintiff contends that the ALJ "ignored" an April 2001 functional assessment and an August 2002

1  work capacity assessment by Dr. Elizabeth Leonard, plaintiff's treating psychiatrist at Riverside County
2  Department of Mental Health ("County Mental Health"). [See JS 3-11].

3  Plaintiff presented to County Mental Health on March 22, 2001 for symptoms of depression, panic
4  attacks, and obsessive-compulsive behaviors, including frequent handwashing. [AR 300]. An initial
5  assessment was completed by a clinician identified as "M.Cale RN" (presumably a registered nurse), who
6  concluded that plaintiff had diagnoses of depression NOS, panic disorder without agoraphobia, and rule out
7  obsessive compulsive disorder. [AR 300-301]. Nurse Cale assigned plaintiff a current Global Assessment
8  of Function ("GAF") score of 48.[3] [AR 300].

9  On April 12, 2001, Dr. Leonard cosigned Nurse Cale's initial assessment form, which included the
10 GAF score of 48.  However, the record indicates that Dr. Leonard did not actually examine plaintiff until
11 the following day, when she conducted an initial "therapeutic medication interview" with plaintiff.  [AR
12 294-297]. Plaintiff recounted a history of having a "severe anxiety attack" resulting in hospitalization in
13 1994, and she said that she received outpatient treatment at County Mental Health from 1994 until 1996.
14 [AR 294]. Based on her examination, Dr. Leonard diagnosed major depression, recurrent, without psychosis;
15 obsessive compulsive disorder; panic disorder without agoraphobia; and chronic pain disorder. [AR 295-
16 296]. Dr. Leonard assigned plaintiff a GAF score of 55, signifying moderate symptoms, such as flat affect
17 or occasional panic attacks, or moderate difficulty in social, occupational, or school functioning, such as
18 having few friends or conflicts with peers or co-workers. DSM-IV, Multiaxial Assessment 30, 34.  That
19 higher GAF score suggests that after having the opportunity to examine plaintiff herself, Dr. Leonard
20 concluded that plaintiff's condition was less severe than she had indicated by cosigning Nurse Cale's intake
21 assessment only a day earlier.  Dr. Leonard prescribed Paxil to relieve plaintiff's symptoms of depression,

---

[3]  The GAF score is a "multiaxial" assessment that reflects a clinician's subjective judgment of a patient's overall level of functioning by asking the clinician to rate two components: the severity of a patient's psychological *symptoms,* or the patient's psychological, social, and occupational *functioning*.  The GAF score is the lower of the symptom severity score or the functioning severity score.  A GAF score of 41 to 50 denotes serious symptoms, such as suicidal ideation or severe obsessional rituals, or any serious impairment in social, occupational, or school functioning, such as the absence of friends or the inability to keep a job. See American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") Multiaxial Assessment 30, 34 (4th ed. 1994)(revised 2002).

obsessive compulsive disorder, and panic disorder, and Elavil to reduce chronic pain and improve sleep. [AR 296, 299].

Dr. Leonard's diagnoses did not change during the course of treatment, but she did adjust plaintiff's medications based on plaintiff's therapeutic response.[4]  [AR 292, 298, 320-329]. In August 2002, Dr. Leonard completed a "Work Capacity Evaluation" form indicating that plaintiff had "moderate" to "marked" work-related functional limitations and could be expected to miss three days or more of work a month. [AR 303-304]. Plaintiff last visited Dr. Leonard in September 2002. [AR 328]. She did not keep a return appointment scheduled for December 2002. [AR 328]. In February 2003, Dr. Leonard closed plaintiff's chart "due to lack of follow-up." [AR 329].

The ALJ gave specific, legitimate reasons supported by substantial evidence for rejecting Dr. Leonard's assessments, which were contradicted by the opinions of other examining and non-examining doctors. [AR 19, 54-55; see AR 395-401, 405-418, 482-489 ]. The ALJ permissibly noted inconsistencies between Dr. Leonard's assessments and the reports of another treating physician, Dr. Street. See 20 C.F.R. §§ 404.1527(d)(4), 416.927(d)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion."). For example, the ALJ remarked that before plaintiff sought treatment at County Mental Health in March 2001, Dr. Street indicated that plaintiff did not have a significant mental disorder. [AR 54]. The ALJ cited a February 2001 report from Dr. Street to support that assertion.[AR 54 (citing Ex. B-8F at 2-3)]. Unfortunately, the reconstructed administrative record filed in this case does not contain a February 2001 report from Dr. Street in Exhibit B-8F. Instead, Exhibit B-8F contains progress reports from Dr. Street from 1999 and 2000. [AR 275-280].  The record elsewhere contains additional progress reports from Dr. Street dated May 16, 2001 through October 10, 2006.[AR 419-424, 465-481, 529-530].

Although there appears to be no February 2001 report from Dr. Street in the reconstructed record, Dr. Street's 1999 and 2000 progress are included, and those reports support the ALJ's determination that Dr. Street did not assess any significant mental disorder. Dr. Street began treating plaintiff in 1999 with a

---

[4] During the course of treatment with Dr. Leonard, plaintiff's medications included Paxil, Elavil, Zanaflex (a muscle relaxant), Vicodin for pain, Luvox (an antidepressant used to treat OCD), Neurontin for generalized anxiety and chronic pain, and Anafranil. [AR 316, 318, 324, 330-333].

medication regimen that included Paxil, Ultram (an analgesic), and the narcotic pain reliever Vicodin. [AR 275-280]. There were no documented complaints of any mental symptoms or adverse effects from Paxil during plaintiff's medication checks in March, October, and December 1999 and July 2000.[AR 277-280]. She was continued on Paxil. On August 2, 2000, Dr. Street remarked that "[o]n today's visit [plaintiff] has no complaint, the medication she is now taking is doing a satisfactory job. . . .[¶] Patient appears to have reached a stable level with her medication and needs no changes." [AR 276]. In September 2000, Dr. Street again reported that plaintiff had no complaints and that she "appears[ed] to have reached a stable level with her medication and needs no changes." [AR 275]. Her prescriptions, which still included Paxil, were "verified for future refilling . . . ." [AR 275]. Those records are sufficient to show that the ALJ reasonably relied on Dr. Street's reports to find no significant mental problems in the months preceding plaintiff's first visit to Dr. Leonard.

When plaintiff began seeing Dr. Leonard at County Mental Health, she continued to see Dr. Street. He stopped prescribing Paxil, but he continued to treat plaintiff for pain complaints and sleep problems while she was under Dr. Leonard's care. After plaintiff stopped seeing Dr. Leonard in September 2002, she continued regular visits to Dr. Street until 2006, but he did not restart plaintiff on Paxil or prescribe other psychotropic drugs for her during that period. Dr. Street noted that plaintiff's subjective symptoms were "adequately controlled" or "well managed" on the pain and sleep medications he prescribed. [See AR 420-424, 465-481]. Thus, the ALJ reasonably concluded that plaintiff neither sought nor received psychiatric treatment after she voluntarily discontinued seeing Dr. Leonard in September 2002. [AR 19, 21, 54].

The ALJ also rejected the severity of Dr. Leonard's functional restrictions as "grossly inconsistent" with the "consistently minimal to mild objective findings" noted in her treatment reports as a whole. The ALJ noted that Dr. Leonard's initial mental status examination of plaintiff on April 13, 2001 demonstrated only mild abnormalities. [AR 54, 295, 301]. Plaintiff was fully oriented, friendly and cooperative. Her speech was normal and spontaneous. Plaintiff's affect was "full" and "anxious." Her mood was euthymic, but she displayed some agitation. Memory, attention, and concentration were good. Perceptions were normal. No suicidal ideation was present. Her thinking was logical. She was able to interpret proverbs abstractly. Her cognitive functioning was in the average range. Insight and judgment were adequate. [AR 295]. Those findings were similar to the mental status examination findings made on plaintiff's initial visit

to County Mental Health a month earlier. [AR 301]. On March 22, 2001, plaintiff's affect was blunted; however, her appearance, orientation, mood, attention, concentration, intelligence, and psychomotor skills were within normal limits. Her insight was good, but her judgment was fair to poor. She denied hallucinations. [AR 301]. It appears that the GAF score of 48 assigned plaintiff by Nurse Cale on intake reflected plaintiff's subjective medical history and her account of social and family problems, such as "chaos" caused by her grown children's drug use, plaintiff's attempts to obtain guardianship of her grandson, and her "controlling" ill mother, who was staying with plaintiff. [AR 300].

In her initial treatment plan, Dr. Leonard wrote that she was increasing plaintiff's Paxil dose from 20 to 40 milligrams a day because plaintiff's symptoms "of mild depression, OCD & panic attacks 'better' on meds, but still present. No adverse med effects." Dr. Leonard also prescribed Elavil to decrease pain and improve sleep. [AR 296, 299]. During the course of treatment, Dr. Leonard reported occasional exacerbation in plaintiff's symptoms, such as a blunted or constricted affect or episodes of increased OCD behaviors [e.g. AR 320, 327], but Dr. Leonard did not document any severe or prolonged deterioration in plaintiff's "mild" symptoms.

As the ALJ pointed out, moreover, Dr. Leonard's notes also disclose "questionable compliance with prescribed treatment" on plaintiff's part. [AR 54]. Plaintiff's compliance was inconsistent, as indicated by notations of a minus sign ("-") or a plus and minus sign ("+/-") under the heading "Med. Compliance" in some of Dr. Leonard's progress notes [e.g., AR 320, 324], and plaintiff discontinued one of her prescribed medications without first consulting Dr. Leonard. [AR 320]. The ALJ remarked that Dr. Leonard arranged for plaintiff to attend therapy, but plaintiff subsequently told Dr. Leonard that she did not attend because she had to care for two children (apparently referring to her grandchildren). [AR 54, 319-320, 327].

In addition, the ALJ observed that plaintiff "repeatedly missed" appointments with Dr. Leonard. [AR 54]. Plaintiff was scheduled for monthly medication monitoring appointments with Dr. Leonard, but she either was a "no show" or called to reschedule appointments scheduled for June 8, 2001, November 27, 2001, February 22, 2002, June 5, 2002, July 11, 2002, July 17, 2002, August 12, 2002, and December 9, 2002. [AR 298, 320, 322, 325-326, 328].

The ALJ permissibly rejected Dr. Leonard's treating source assessments because they were inconsistent with her treatment notes and with the medical record as a whole. See Connett v. Barnhart, 340

1  F.3d 871, 874-875 (9th Cir. 2003) (holding that the ALJ did not err in rejecting the controverted opinion
2  of a treating physician whose restrictive functional assessment was not supported by his treatment notes);
3  see also Bayliss, 427 F.3d at 1217 (noting that "an ALJ need not accept the opinion of a doctor if that
4  opinion is brief, conclusory, and inadequately supported by clinical findings," and holding that the ALJ
5  properly rejected a treating physician's opinion that was contradicted by the doctor's treatment notes). In
6  addition, Dr. Leonard's August 2002 functional evaluation was a "check the box" form without any
7  supporting clinical or objective findings or any explanation of how the "mild" symptoms and limited clinical
8  findings in Dr. Leonard's progress notes translated into such a broad array of moderate and marked work
9  deficits.  See Batson, 359 F.3d at 1195 & n.3 (upholding the ALJ's rejection of an opinion that was
10 "conclusionary in the form of a check-list" and lacked supporting clinical findings).

   Therefore, the ALJ's reasons for rejecting Dr. Leonard's conclusions were supported by substantial evidence and free of legal error.

**Consultative psychiatrist**

   Plaintiff contends that the ALJ improperly ignored the October 2003 opinion of the Commissioner's board-certified examining psychiatrist, M. Christine Lyster, M.D., that plaintiff is moderately impaired in the ability to withstand the stress and pressures associated with an eight-hour workday and day-to-day work activities.  [JS 11-14; see AR 395-401].

   In his December 2007 opinion on remand, the ALJ pointed to plaintiff's lack of ongoing mental health treatment, mild abnormalities on mental status examination, and the opinion of consultative examiner Reynaldo Abejuela, M.D., to support his finding that plaintiff's depressive disorder NOS did not produce any significant mental functional limitations.  [AR 19].  Dr. Abejuela, a board-certified consultative psychiatrist and neurologist who examined plaintiff at the Commissioner's request in August 22, 2007, opined that plaintiff's mental status examination findings established only mild depression and mild anxiety. [AR 21, 482-489].  He concluded that plaintiff's "psychiatric limitations are none to mild." [AR 483].

   Dr. Lyster and Dr. Abejuela had similar levels of expertise. Both conducted one-time examinations consisting of an interview, records review, a mental status examination, diagnosis, prognosis, functional assessment, and assessment of competency to handle funds. [AR 395-401, 482-489].  Their mental status examination findings were generally consistent and were accurately summarized by the ALJ as generally

"within normal limits except for mildly depressed mood with congruent affect . . . ." [AR 19]. Both Dr. Lyster and Dr. Abejuela found that plaintiff could understand, remember, and carry out simple one or two-step job instructions. Dr. Lyster opined that plaintiff was not impaired in performing detailed and complex instructions, while Dr. Abejuela found a mild impairment in that area. Both doctors concluded that plaintiff had a mild impairment in plaintiff's ability to interact with supervisors, coworkers, and the general public. Dr. Lyster opined that plaintiff could maintain concentration and attention. Dr. Abejuela did not make a specific finding on that point. Dr. Abejuela opined that plaintiff had a mild impairment in the ability to respond appropriately to usual work situations and to changes in a routine work setting, but that she was not precluded from functioning. Dr. Lyster said that plaintiff was moderately impaired in the ability to withstand the stresses of a usual work day and daily work activities. [AR 400, 482-483].

Thus, Dr. Lyster's and Dr. Abejuela's opinions are generally consistent, except that Dr. Lyster found a "moderate" impairment in dealing with routine work stresses, while Dr. Abejuela found no more than a mild impairment in any mental functional ability. Contrary to plaintiff's suggestion, a "moderate" impairment in one area is not inconsistent with the ALJ's finding that plaintiff did not have an independently severe mental impairment that significantly limited her ability to work. See Koehler v. Astrue, 282 Fed.Appx. 443, 445, 2008 WL 2475747, at *1 (9th Cir. 2008)(holding that in finding that plaintiff had a "nonsevere" mental impairment, "the ALJ did not implicitly reject without reason [a physician's] opinion that [the claimant] suffered from a moderate mental impairment. The regulatory scheme–specifically, 20 C.F.R. § 404.1520a–does not mandate that the diagnosis of a 'moderate' degree of limitation in one's ability to respond to changes in the workplace setting must be found to a [severe] mental impairment."); Michael v. Apfel, 2000 WL 1006534, at *5-*6 (N.D. Cal. 2000) (holding that a claimant who was "not significantly limited" in some areas and "moderately limited" in others had not shown that his mental impairment significantly affected his ability to perform basic work activities), aff'd, 31 Fed.Appx. 557 (9th Cir. 2002); cf. Hoopai v. Astrue, 499 F.3d 1071, 1076-1077 (9th Cir. 2007)(holding, at step five of the sequential evaluation, that treating diagnoses of "moderately significant forms of depression" with "limited treatment" and a non-examining physician's finding of a moderate impairment in several areas, including the ability to complete a normal workday and work week without interruption from psychologically-based symptoms, "was not a sufficiently severe non-exertional limitation" so as to prohibit reliance on the grids).

The ALJ's finding that plaintiff did not have an independently severe mental impairment was not an implicit rejection of Dr. Lyster's opinion that plaintiff was moderately impaired in one mental functional ability. Plaintiff's argument is rejected.

### Non-examining state agency physician

Plaintiff argues that the ALJ erred in rejecting the October 2003 opinion of a non-examining state agency physician, Dr. Kalmar, who opined that plaintiff was limited to light work. [See JS 17-21].

The ALJ's rejection of Dr. Kalmar's non-examining opinion was not error. To the contrary, the ALJ properly gave more weight to the opinion of the Commissioner's examining orthopedist, Dr. Wirganowicz, who examined plaintiff in August 2007 and opined that plaintiff could perform medium work. [AR 491-496]. See Erickson v. Shalala, 9 F.3d 813, 818 n.7 (9th Cir. 1993) ("[T]he non-examining physicians' conclusion, with nothing more, does not constitutes substantial evidence, particularly in view of the conflicting observations, opinions, and conclusions of an examining physician.")(quoting Pitzer v. Sullivan, 908 F.2d 502, 506 n.4 (9th Cir. 1990)).

### Severity determination

Plaintiff argues that the ALJ's decision is internally inconsistent, and therefore defective, because the ALJ listed plaintiff's depressive disorder NOS as a severe impairment but also made a specific finding that she had no severe mental impairment. [See JS 14-16].

At step two of the sequential evaluation process, the ALJ found that plaintiff had a "*combination of severe impairments,*" which included depressive disorder NOS. [AR 18 (italics added)]. See 20 C.F.R. §§ 404.1520(4)(ii), 416.920(40(ii)(stating that at the second step of the sequential evaluation process, the issue is whether the claimant has an impairment or a combination of impairments that is severe). The ALJ did not find plaintiff's depressive disorder NOS, standing alone, to be severe. Accordingly, there was no error in the ALJ's determination that plaintiff did not have an independently severe mental impairment, and that finding is supported by substantial evidence.

### Hypothetical question

Plaintiff contends that the ALJ erred in omitting from his hypothetical question to the vocational expert the GAF score of 48 endorsed by Dr. Leonard on April 12, 2001, and the moderate impairment in ability to withstand work stress found by Dr. Lyster. [See JS 21-23].

10

The ALJ's job at the fifth step in the sequential evaluation procedure is to pose hypothetical questions that set out all of the claimant's impairments for the consideration of the vocational expert, who then "translates these factual scenarios into realistic job market probabilities . . . ." Tackett v. Apfel, 180 F.3d 1094, 1101 (9th Cir. 1999). Hypothetical questions posed to the vocational expert must accurately describe all of the limitations and restrictions of the claimant that are supported by substantial evidence in the record. Robbins, 466 F.3d at 886; Tackett, 180 F.3d at 1101. A vocational expert's response to a hypothetical question constitutes substantial evidence only if it is supported by the medical evidence. Embrey v. Bowen, 849 F.2d 418, 422 (9th Cir. 1988).

Because the ALJ permissibly rejected the opinions of Dr. Leonard and Dr. Lyster, he did not err in omitting from his hypothetical question particular limitations assessed by those doctors. The vocational expert's testimony constituted substantial evidence supporting the ALJ's finding that plaintiff's RFC for medium work with no severe mental impairment did not preclude her from performing her light, skilled and semi-skilled past relevant work as a photographer and a photo laboratory technician, respectively. [See AR 22]. Therefore, plaintiff's contention lacks merit.

### Conclusion

For the reasons stated above, the Commissioner's decision is supported by substantial evidence and is free of legal error. Accordingly, the Commissioner's decision is **affirmed.**

**IT IS SO ORDERED.**

DATED: March 5, 2009

_____
ANDREW J. WISTRICH
United States Magistrate Judge